FILED IN OPEN COURT
U.S.D.C ATLANTA

JUL 23 2014

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GARY W. LANG | Criminal Information<br><br>No. 1:14-CR-274 |

THE UNITED STATES ATTORNEY CHARGES THAT:

### COUNT ONE
### Conspiracy to Pay and Receive Remuneration in Exchange for Medicaid Patient Referrals
### (18 U.S.C. § 371)

### BACKGROUND

At all times relevant to this Bill of Information, unless otherwise stated:

### The Medicaid Program

1. Medicaid is a cooperative federal-state public assistance program established by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, under which federal matching funds are available to states that elect to pay for all or part of specified health care services furnished to eligible low-income persons, among others. From 2008 to 2009, the United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), provided approximately 60% of the funding for the Georgia Medicaid program.

2. Medicaid is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b). Medicaid is also a "Federal health care program," as defined in Title 42, United States Code, Section 1320a-7b(f). Individuals who receive any type of benefit under Medicaid are referred to as Medicaid "beneficiaries."

3. The Georgia Medicaid program covers costs associated with emergency labor and delivery services provided by a hospital to pregnant women who meet Medicaid financial eligibility requirements, but who are ineligible for Medicaid due to their status as an illegal alien ("Emergency Medical Assistance" or "EMA"), 42 U.S.C. § 1396b(v)(2)-(3).

4. The Georgia Medicaid program also covers certain costs associated with medical services provided by a hospital to a child born to a mother eligible for and receiving EMA ("Newborn Medicaid").

5. Hospitals that provide services to Medicaid beneficiaries are able to apply for and obtain "provider numbers." Hospitals that are issued a Georgia Medicaid provider number are able to file claims with Georgia Medicaid to obtain reimbursement for services provided to Medicaid beneficiaries.

6. In Georgia, provider hospitals are required to enter into a contract with the state referred to as a "provider agreement." The provider agreement, among other things, prohibits provider hospitals from paying remuneration for referrals of Medicaid patients and further prohibits provider hospitals from billing Medicaid for services rendered to these patients.

7. The federal Anti-Kickback Statute ("AKS") prohibits any person from knowingly and willfully offering or paying any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment can be made in whole or part by a Federal health care program. 42 U.S.C. § 1320a-7b(b)(2).

8. The AKS likewise prohibits any person from knowingly and willfully soliciting or receiving remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment can be made in whole or part by a Federal health care program. 42 U.S.C. § 1320a-7b(b)(1).

9. In Georgia, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to Medicaid beneficiaries to the Georgia Department of Community Health for payment.

10. The Georgia Medicaid program would not pay claims submitted by a provider hospital that it knew were the result of a provider hospital's payments to any person for the referral of Medicaid beneficiaries.

### Relevant Entities and Defendant

11. Hispanic Medical Management, Inc. d/b/a Clinica de la Mama and its affiliate, Clinica de la Mama, Inc. d/b/a Clinica de la Mama (collectively referred to as "Clinica"), were Georgia corporations headquartered in the Northern District of Georgia. From at least 1999 to September 2010, Clinica operated

medical clinics that provided prenatal care to undocumented Hispanic women in Norcross, Austell, Cumming, Forest Park, Roswell, Lovejoy, Lawrenceville, Windy Hill (Smyrna), and Plaza Fiesta (Chamblee), Georgia, and in Hilton Head, South Carolina, at various times.

12. Tracey Cota was the Chief Operating Officer of Clinica from at least 2000 until in or around September 2010.

13. Company C was a publicly-held Florida-based corporation that owned and operated hospitals throughout the United States. Company C's subsidiary, Hospital C-1, was located in Monroe, Georgia. From at least March 2008 to at least November 2009, Hospital C-1 was enrolled as a provider in the Georgia Medicaid program and billed the Georgia Medicaid program for EMA and Newborn Medicaid services, at various times.

14. GARY LANG was the Chief Executive Officer of Hospital C-1 from November 2007 to March 2010.

### Overview of the Conspiracy

15. As described further below, GARY LANG, Tracey Cota and others agreed that Clinica would be compensated for referring its patients to Hospital C-1 for delivery. To accomplish this goal, Hospital C-1 contracted with, and paid, Clinica to provide services to the hospital, but the true purpose of the relationship was to pay for Medicaid patient referrals.

16. As a result, Hospital C-1 was able to bill Georgia Medicaid for hundreds of thousands of dollars for labor and delivery services provided to Clinica patients and services provided to their newborns.

4

## Conspiracy to Pay and Receive Remuneration in Exchange for Medicaid Patient Referrals

17. From in or around March 2008 to in or around November 2009, in the Northern District of Georgia and elsewhere, GARY LANG did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, agree and have a tacit understanding with Tracey Cota, and others known and unknown to the United States Attorney, to commit certain offenses against the United States, namely

   a. To violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole and in part by a Federal health care program, that is, the Georgia Medicaid program; and

   b. To violate Title 42, United States Code, Section 1320a-7b(b)(1) by knowingly and willfully soliciting and receiving remuneration, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, the Georgia Medicaid program.

### Purpose of the Conspiracy

18. The purpose of the conspiracy was for GARY LANG, Tracey Cota, and their co-conspirators to unlawfully enrich themselves and Hospital C-1 by

paying and receiving illegal remuneration in exchange for referrals of Medicaid patients so that Hospital C-1 could bill and obtain money from the Georgia Medicaid program for services provided to the unlawfully referred Medicaid patients and their newborns.

## Manner and Means of the Conspiracy

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

19. Tracey Cota and others operated several Clinica clinics located in the Northern District of Georgia and on Hilton Head Island, South Carolina that provided prenatal care predominantly to undocumented Hispanic women who did not have health insurance. Depending how far along a woman was in her pregnancy, Clinica charged between $1,200 to $1,700 cash for prenatal care, which covered office visits with medical professionals, certain laboratory testing, and one ultrasound.

20. With some limited exceptions, Clinica did not employ or pay obstetricians ("OBs") or mid-level practitioners, such as midwives or nurse practitioners ("mid-levels"), to provide medical services at Clinica. Tracey Cota and others allowed certain OBs to see patients at the Clinica clinics. These OBs and their mid-levels provided free prenatal care to Clinica patients with the understanding and expectation that when it came time for the patient to deliver, Clinica staff would ensure that the patient delivered at the hospital where the OB had privileges so that the OB or his/her call group could deliver the baby and

that his/her practice could bill and receive payment from Medicaid for the professional fees for the delivery.

21. GARY LANG understood that Clinica was very successful at attracting pregnant, undocumented Hispanic women to its clinics for prenatal care, that Clinica could control where these women delivered their babies, and that if these women delivered at Hospital C-1, the hospital could potentially realize a significant revenue stream from Georgia Medicaid for providing labor and delivery services to these women (EMA) and providing services to their newborn babies (Newborn Medicaid).

22. GARY LANG and others created and caused to be created a contract between Hospital C-1 and Clinica under which Hospital C-1 agreed to pay Clinica to provide various services, including translation services, translation management services, and Medicaid eligibility determination paperwork. However, the understanding between GARY LANG, Tracey Cota, and others was that Hospital C-1's contract with and payments to Clinica were conditioned on and in exchange for Clinica referring patients to Hospital C-1. In fact, Hospital C-1 did not have a need for the services outlined in the contract unless Clinica referred patients to Hospital C-1. GARY LANG understood and agreed that the true purpose of this arrangement was to compensate Clinica for referring patients to deliver at Hospital C-1.

23. GARY LANG, Tracey Cota, and others recruited OBs who had privileges at Hospital C-1 to provide prenatal care in the Clinica clinic located in Lawrenceville, Georgia, and to deliver these patients at Hospital C-1.

24.    Clinica staff assigned these Hospital C-1-credentialed physicians certain day and time slots to see patients at the Clinica clinic in Lawrenceville. At or near the patient's first prenatal appointment, she was asked to provide a preferred day of the week and time for her periodic prenatal appointments which determined who her OB would be.

25. To ensure that Clinica patients at the Lawrenceville clinic delivered at Hospital C-1, each patient was provided with an identification card at or near her first appointment that identified her assigned OB and hospital, Hospital C-1. The majority of the patients never questioned whether they had the option of delivering at a different hospital. If a patient did ask the Clinica staff whether they could deliver their baby at a different, perhaps more convenient hospital, the Clinica staff was instructed to discourage them from doing so, emphasized the high likelihood of success of getting EMA coverage at Hospital C-1, and suggested that they might not be successful at getting EMA coverage at another hospital.

26.    Clinica staff assisted the women with filling out the requisite paperwork in order to qualify them for EMA and forwarded the paperwork to Hospital C-1. Following delivery, Clinica staff followed through to ensure that the Medicaid eligibility paperwork for mother and baby was completed so that Hospital C-1 could successfully bill and be paid by Georgia Medicaid for the costs of providing labor and delivery services to the mother and services provided to the newborn child.

## Overt Acts

In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Northern District of Georgia and elsewhere, including but not limited to the following overt acts:

27. In or around January 2008, GARY LANG, Tracey Cota, and others discussed Clinica referring patients to Hospital C-1 in exchange for Hospital C-1 contracting with and paying Clinica to provide services to Hospital C-1.

28. On or about February 13, 2008, GARY LANG sent an e-mail to Tracey Cota discussing anticipated payments by Hospital C-1 to Clinica.

29. On or about March 25, 2008, GARY LANG and Tracey Cota signed a contract between Clinica and Hospital C-1 under which Hospital C-1 agreed to pay Clinica to provide services, including translation and Medicaid eligibility determination services, to Hospital C-1.

30. On or about April 2, 2008, GARY LANG wrote a memorandum to executives of Company C outlining Hospital C-1's proposed financial relationship with Clinica.

31. On or about August 6, 2009, Tracey Cota prepared a letter addressed to GARY LANG regarding Clinica's final invoice to Hospital C-1 and Clinica's decision to close its Lawrenceville clinic.

32. On or about August 6, 2009, Tracey Cota prepared Clinica invoice #10025 for Hospital C-1 requesting $4,178.13 in payment.

33.    On or about September 1, 2009, Tracey Cota deposited into a Clinica bank account a check in the amount of $4,178.13 received from Hospital C-1 for payment of Clinica invoice #10025.

All in violation of Title 18, United States Code, Section 371.

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

*Sally B. Molloy*
SALLY B. MOLLOY
ASSISTANT U.S. ATTORNEY
Georgia Bar No. 140816

JEFFREY H. KNOX
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

*O. Benton Curtis, III* by SBM
O. BENTON CURTIS III
ASSISTANT CHIEF

*Robert A. Zink* by SBM
ROBERT A. ZINK
ASSISTANT CHIEF

600 U.S. Courthouse
75 Spring St., SW
Atlanta, GA 30303
404-581-6000; Fax 404-581-6181